## AFFIDAVIT

I, Detective John Pickens, being first duly sworn, hereby depose and state as follows:

1.     I make this Affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c)(1)(A) for information about the location of the cellular telephone assigned call numbers **(424) 531-0818** ("**Target Telephone**"), used by **Mary Corona**, whose wireless service provider is Sprint.

2.     I am a Detective with the Kansas City, Missouri Police Department (KCMOPD) and have been employed by KCMOPD for 21 years.  I have been assigned to the Narcotics and Vice Division for eight years, conducting and assisting in narcotics investigations.  During my tenure with the Narcotics and Vice Division, I have been involved with numerous investigations in the importation and distribution of controlled substances.  I have communicated extensively with other state and federal law enforcement personnel who specialize in drug investigations.

3.     I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18 of the United States Code, that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516.

4.     The facts in this Affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses.  This Affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5.      Based on the facts set forth in this Affidavit, there is probable cause to believe that violations of 21 U.S.C. §§ 841(a) and 846 have been committed, are being committed, and will be committed by **Mary CORONA** (hereinafter "**CORONA**").  There is also probable cause to believe that the location information sought will constitute evidence of these criminal violations, and will lead to the identification of individuals who are engaged in the commission of these offenses.

## PROBABLE CAUSE

6.      The KCMOPD and the Federal Bureau of Investigations (FBI), are conducting a drug trafficking investigation targeting **CORONA** and others.  The investigation to date has identified **CORONA**, who presently resides in Kansas City, Missouri, as one of the primary organizers of this drug trafficking organization.   **CORONA** organizes and coordinates methamphetamine distribution throughout the Western District of Missouri.  **CORONA** works with numerous identified and unidentified co-conspirators to facilitate methamphetamine distribution in Missouri and Kansas.

7.      On January 29, 2019, a Confidential Human Source (CHS 1) attempted a controlled purchase of one ounce of methamphetamine from a location in Kansas City, Missouri within the Western District of Missouri.  Upon the CHS 1's arrival at 6705 Fairway Drive, Kansas City, Missouri, a male suspect of the investigation was counting a large amount of U.S. currency.  The male suspect informed the CHS 1 he had to go collect money from someone and was unable to sell the CHS 1 methamphetamine at the moment.  A female, referred to as "Maria," who was in the residence at the time, took a large sum of cash outside of the residence and met with an unknown individual. "Maria" returned inside of the residence with a gallon size Ziploc bag, approximately half full, of methamphetamine. "Maria" was later identified as Mary **CORONA**.

8.     During the following month, investigators received information from several confidential sources that **CORONA** had been the negotiating interpreter between the "Mexicans" who were delivering methamphetamine and an unknown "Russian" who was purchasing multiple kilogram amounts of methamphetamine at 6705 Fairway Drive, Kansas City, Missouri. Investigators developed information from another confidential human source, CHS 2 that **CORONA** was living at 7130 Highland Ave., Kansas City, Missouri.

9.     On March 7, 2019, investigators were conducting surveillance at 7130 Highland Avenue, Kansas City, Missouri.  An unknown female, later identified as **CORONA**, was observed leaving the residence and occupying a blue Honda Del Sol.  A traffic stop of **CORONA** was conducted and she was subsequently arrested for driving while suspended.  An in-custody interview was conducted of **CORONA**.  **CORONA** was advised of her Miranda Rights and agreed to speak with detectives.  **CORONA** stated her moniker was "Maria" and she spoke fluent Spanish. During the interview, **CORONA** stated she knows a "Russian" methamphetamine dealer who lives at 6705 Fairway Drive, Kansas City, Missouri.  **CORONA** stated she was previously the "go between" for the Russian and his Mexican source of supply for methamphetamine.  **CORONA** stated she has been facilitating multi-kilogram narcotics transactions of methamphetamine between **CORONA** and this target for over six months on a regular basis.  **CORONA** stated the largest deal she has facilitated is approximately fifteen kilograms of methamphetamine and was ordering four to five kilograms per day. In a conservative estimate, investigators know **CORONA** facilitated the transaction of approximately four hundred and fifty kilograms of methamphetamine as the "go between" for the Russian and the Mexican source of supply.  **CORONA** further informed investigators that the male suspect and his partners have held her and other individuals at gun point in regard to narcotics dealings.  The information provided by **CORONA** was

corroborated and believed to be true through other law enforcement agents and confidential sources of information.

10.     On March 8, 2019, investigators conducted a controlled purchase of methamphetamine from the male suspect at 6705 Fairway Drive utilizing **CORONA** as a Confidential Human Source, using her phone number (816) 645-1989 at the time. **CORONA** responded to the location.  **CORONA** met with the male suspect and handed him $6,500 in pre-recorded funds.  The male suspect left the residence to obtain the methamphetamine.  The male suspect contacted and instructed **CORONA** to meet him at 3017 Topping Ave., Kansas City, Missouri.  The male suspect then met **CORONA** at this location and handed **CORONA** one kilogram of methamphetamine.  Following the narcotics transaction, **CORONA** responded to an undisclosed location where investigators took possession of the purchased methamphetamine.  The methamphetamine purchased by **CORONA** had an approximate weight of 1,021.79 grams and field tested positive.

11.     **CORONA** stayed in contact with investigators on a regular basis utilizing phone number (816) 645-1989.  During this time period, **CORONA** continued to supply law enforcement with information related to the ongoing investigation. The information provided by **CORONA** was corroborated and believed to be true. **CORONA** participated with investigators and made multiple kilogram purchases of methamphetamine in the ongoing investigation.

12.     **CORONA** soon became at odds with the male suspect of the ongoing investigation and began explaining to investigators she had many other methamphetamine dealers she could purchase kilograms of methamphetamine from. **CORONA** was instructed that this investigation was narrow and targeting a specific suspect who was known to be violent. **CORONA** was instructed only to be involved in criminal activity at the direction of law enforcement.  **CORONA**

remained in contact with investigators on a regular basis from March 8, 2019 through Friday, April 19, 2019. On April 19, 2019, **CORONA** stopped responding to phone calls and text messages from investigators. Investigators searched for **CORONA** and checked her known residence and prior locations she had been known to stay. Investigators were informed **CORONA** had moved away and did not leave any forwarding information.

13.     On May 6, 2019, investigators were notified by detectives of the Kansas City, Kansas Police Department that **CORONA** was in custody from a traffic stop.  During the traffic stop, **CORONA** was found in possession of .3 grams of methamphetamine. Investigators responded to the Kansas City, Kansas Police Department's interview room to reconnect with **CORONA**. Investigators from the FBI and KCMOPD entered the interview room to have a consensual conversation with **CORONA** regarding her prior commitment to staying in contact with investigators as Confidential Human Source. **CORONA** started the conversation by apologizing for not staying in contact with investigators and stated she wanted to be honest with what she had been involved with. **CORONA** immediately stated that while she was not in contact with investigators, she had made contact with a Mexican Cartel captain named "Wero" and had made two trips to California to pick up methamphetamine. **CORONA** stated she had a new source of methamphetamine in California with her partner, Luarentino Rios (Tino), from Monroe City, Missouri. **CORONA** stated she had obtained a new phone number from California, (the "**Target Telephone"**). **CORONA** stated she destroyed her old cell phone and sim card. **CORONA** admitted she and Tino drove out to Bell Gardens, California in Tino's tan Kia Optima bearing Missouri license plate EB4 N6Y to purchase methamphetamine. **CORONA** admitted she met with "Wero" in Bell Gardens, California, who uses phone number (562) 632-3769. **CORONA** stated she and Tino picked up five pounds of methamphetamine and transported it back to Missouri where

she and Tino split it up. **CORONA** informed investigators she made a second trip back to Bell Gardens, California, to pay the debt owed for the five pounds of methamphetamine. **CORONA** said she paid a total of $13,000.00 for the five pounds of methamphetamine. **CORONA** stated she has stayed in contact with her California supplier "Wero" on his phone number (562) 632-3769, utilizing the **Target Telephone**. **CORONA** stated she and Tino were planning on going to California this week to pick up twenty-one pounds of methamphetamine, several pounds of cocaine and heroin, which were going to be fronted to her by "Wero" in Bells Garden, California.

14. Due to my training and experience, I believe **CORONA** is no longer a trustworthy Confidential Human Source and is a narcotics distributor in the Kansas City metropolitan area. The two prior trips **CORONA** stated she made to California where she obtained five pounds of methamphetamine were not under the direction or control of law enforcement. **CORONA** was acting on her own behalf for her own benefit. **CORONA** knew this and took actions to block law enforcement by admitting to destroying her phone, which she had previously used to remain in contact with law enforcement on a regular basis. I believe **CORONA** will be making a trip to California immediately to pick up the above listed narcotics she spoke about.

15. In my training and experience, I have learned that Sprint is a company that provides cellular telephone access to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate at least two kinds of information about the locations of the cellular telephones to which they provide service: (1) E-911 Phase II data, also known as GPS data or latitude-longitude data, and (2) cell-site data, also known as "tower/face information" or cell tower/sector records. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the

provider's cell towers.  Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected.  These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas.  Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device.  Accordingly, cell-site data is typically less precise that E-911 Phase II data.

16.     Based on my training and experience, I know that Sprint can collect E-911 Phase II data about the location of the **Target Telephone**, including by initiating a signal to determine the location of the **Target Telephone** on Sprint's network or with such other reference points as may be reasonably available.

17.     Based on my training and experience, I know that Sprint can collect cell-site data about the **Target Telephone**.  Subscriber information on the **Target Telephone** has been requested from Sprint via subpoena.

## AUTHORIZATION REQUEST

18.     Based on the foregoing, I believe there is probable cause to believe that the requested information will lead to evidence regarding the activities described above and that the **Target Telephone**, having assigned number (424) 531-0818, and utilized by **CORONA**, has been and will be used in the distribution of controlled substances in the Western District of Missouri and elsewhere.

_____
John Pickens
Detective
Kansas City, Missouri Police Dept.

Subscribed and sworn to by Affiant on May 10, 2019,



_____
HONORABLE LAJUANA M. COUNTS
United States Magistrate Judge
Western District of Missouri